COOLEY LLP
HEIDI L. KEEFE (178960)
(hkeefe@cooley.com)
LOWELL D. MEAD (223989)
(lmead@cooley.com)
BENJAMIN S. LIN (232735)
(blin@cooley.com)
3175 Hanover Street
Palo Alto, California 94304-1130
Telephone:  +1 650 843 5000
Facsimile:    +1 650 849 7400

COOLEY LLP
PHILLIP E. MORTON (VA SBN 71299)
(admitted *pro hac vice*)
(pmorton@cooley.com)
1299 Pennsylvania, N.W, Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Facsimile: (202) 842-7889

Attorneys for Defendant
Apple Inc.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ONE-E-WAY, INC., a California Corporation,<br><br>                    Plaintiff,<br><br>          v.<br><br>APPLE INC., a California Corporation,<br><br>                    Defendant. | Case No. 2:20-CV-06339-JAK-GJS<br><br>**APPLE'S OPENING CLAIM CONSTRUCTION BRIEF**<br><br>DATE: January 24, 2022<br>TIME: TBD<br>CTRM: 10B<br>JUDGE: Hon. John A. Kronstadt |

Cooley LLP
Attorneys at Law
Palo Alto

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................... 1

II.     BACKGROUND AND OVERVIEW .......................................................... 1

III.    ARGUMENT ............................................................................................ 3

    A.    "audio player," "audio source," and "transmitter" ........................ 3

    B.    "receiver" ........................................................................................ 9

    C.    "headphone" .................................................................................. 11

    D.    "direct" communication / "directly" communicate ...................... 13

    E.    "module adapted to reproduce said generated audio output" ...... 16

    F.    "direct conversion module . . ." ................................................... 18

        1.    The "direct conversion module . . ." elements are means-plus-function elements. .............................................................. 19

        2.    The function of "direct conversion" requires a single down conversion to baseband. ................................................ 19

        3.    The self-serving statements of OEW's counsel in prosecution cannot expand the claims to cover "very near baseband." ............................................................................... 21

        4.    Injecting the vague term of degree "or very near baseband" would render the claims indefinite. ......................... 23

    G.    "high quality audio signal representation" ................................... 24

IV.     CONCLUSION ...................................................................................... 25

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

- i -

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abbott Diabetes Care Inc.*,
   696 F.3d 1142 (Fed. Cir. 2012) ...................................................................... 6, 7

*Ajinomoto Co. v. Int'l Trade Comm'n*,
   932 F.3d 1342 (Fed. Cir. 2019) .................................................................... 15, 16

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018) .................................................................... 23, 24

*Clare v. Chrysler Grp. LLC*,
   819 F.3d 1323 (Fed. Cir. 2016) .................................................................... 21, 22

*Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*,
   958 F.3d 1348 (Fed. Cir. 2020) ......................................................................... 17

*Edwards Lifesciences LLC v. Cook Inc.*,
   582 F.3d 1322 (Fed. Cir. 2009) ......................................................................... 12

*Eon-Net LP v. Flagstar Bancorp*,
   653 F.3d 1314 (Fed. Cir. 2011) ........................................................................... 5

*Farstone Tech., Inc. v. Apple Inc.*,
   No. 8:13-cv-1537-ODW(JEMx), 2015 WL 5898273 (C.D. Cal. Oct.
   8, 2015) .............................................................................................................. 17

*Forest Labs., LLC v. Sigmapharm Labs., LLC*,
   918 F.3d 928 (Fed. Cir. 2019) ......................................................................... 4, 5

*GPNE Corp. v. Apple Inc.*,
   830 F.3d 1365 (Fed. Cir. 2016) ........................................................................... 5

*Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n*,
   936 F.3d 1353 (Fed. Cir. 2019) ......................................................................... 23

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
   452 F.3d 1312 (Fed. Cir. 2006) ................................................................ 9, 10, 22

*Intell. Ventures I LLC v. Motorola Mobility LLC*,
   870 F.3d 1320 (Fed. Cir. 2017) ......................................................................... 12

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

- ii -

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014) ........................................................................ 24

*Meds. Co. v. Mylan, Inc.*,
853 F.3d 1296 (Fed. Cir. 2017) .......................................................................... 7

*Moleculon Rsch. Corp. v. CBS, Inc.*,
793 F.2d 1261 (Fed. Cir. 1986) ........................................................................ 22

*MTD Prods. Inc. v. Iancu*,
933 F.3d 1336 (Fed. Cir. 2019) .......................................................... 16, 17, 19

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014) .......................................................................................... 23

*One-E-Way, Inc. v. Int'l Trade Comm'n*,
859 F.3d 1059 (Fed. Cir. 2017) ........................................................................ 24

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ..................................................... 3, 12

*Poly-America, L.P. v. API Indus., Inc.*,
839 F.3d 1131 (Fed. Cir. 2016) ................................................................ 4, 6, 12

*Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*,
989 F.3d 1002 (Fed. Cir. 2021) .......................................................... 17, 18, 19

*Regents of Univ. of Minn. v. AGA Med. Corp.*,
717 F.3d 929 (Fed. Cir. 2013) ......................................................................... 5, 8

*SightSound Techs., LLC v. Apple Inc.*,
809 F.3d 1307 (Fed. Cir. 2015) ................................................................. 3, 4, 6

*SpeedTrack, Inc. v. Amazon.com, Inc.*,
998 F.3d 1373 (Fed. Cir. 2021) ........................................................................ 15

*Starhome GmbH v AT&T Mobility LLC*,
743 F.3d 849 (Fed. Cir. 2014) ..................................................... 10, 11, 12, 13

*Tech. Props. Ltd. LLC v. Huawei Techs. Co.*,
849 F.3d 1349 (Fed. Cir. 2017) ........................................................................ 15

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

1

2

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

3

4

*Techtronic Indus. Co. v. Int'l Trade Comm'n,*
    944 F.3d 901 (Fed. Cir. 2019) ................................................................. 4

5

6

*Telcordia Technologies, Inc. v. Cisco Systems, Inc.,*
    612 F.3d 1365 (Fed. Cir. 2010) ......................................................... 22

7

8

*Trs. of Columbia Univ. v. Symantec Corp.,*
    811 F.3d 1359 (Fed. Cir. 2016) ........................................................... 4

9

10

*Williamson v. Citrix Online, LLC,*
    792 F.3d 1339 (Fed. Cir. 2015) (en banc) .................................... 16, 17

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

## Table of Exhibits

| Exhibit | Description |
|---|---|
| A | U.S. Patent Application Publication No. US 2003/0118196 A1 ("'196 App.") |
| B | Order No. 12: Construing Terms of the Asserted Patents, *In the Matter of Certain Consumer Electronics and Display Devices with Graphics Processing and Graphics Processing Units Therein*, Inv. No. 337-TA-943 (U.S.I.T.C. July 24, 2015) ("ITC CC Order") |
| C | Notice of Allowability, Application No. 16/185,786 ("'047 Notice of Allowance") |
| D | Interview Summary and Comments on Statement of Reasons for Allowance, dated September 27, 2019, Application No. 16/185,786 ("'047 Comments") |
| E | Excerpts from Hargrave's Communications Dictionary (2001) |
| F | Excerpts from American Heritage Dictionary (2001) |
| G | Excerpts from Webster's New World Dictionary (1995) |
| H | Excerpts from McGraw-Hill Dictionary of Scientific and Technical Terms (2003) |
| I | Excerpts from Collins Concise Dictionary (1999) |
| J | Sony Portable CD Player manual (2001) |
| K | Response to the Final Rejection Dated 05/05/11, Application No. 12/940,747 ('391 patent) |
| L | Advisory Action Before the Filing on an Appeal Brief, dated July 27, 2011, Application No. 12/940,747 ('391 patent) |
| M | Request for Continued Exam and Response to the Final Rejection Dated 05/05/11, Application No. 12/940,747 ('391 patent) |
| N | Response to the Office Action Dated 11/14/2011, Application No. 12/940,747 ('391 patent) |
| O | Excerpts from Federal Standard 1037C, Telecommunications: Glossary of Telecommunication Terms |
| P | Excerpts from Daniel M. Dobkin, *RF Engineering for Wireless Networks, Hardware, Antennas, and Propagation* (2005) ("Dobkin") |
| Q | Ashkan Mashhour et al., *On the Direct Conversion Receiver - - A Tutorial*, Microwave Journal (June 1, 2001) ("Mashhour") |
| R | James P. K. Gilb, *Bluetooth Radio Architectures*, 2000 IEEE Radio Frequency Integrated Circuits Symposium (2000), pp. 3-6 ("Gilb") |
| S | Excerpts from Behzad Razavi, *RF Microelectronics* (1998) ("Razavi") |
| T | Janine Sullivan, *Direct Conversion Receivers: A Buyer's Guide*, EE Times (Nov. 1, 2001) ("Sullivan") |
| U | Asad A. Abidi, *Direct-Conversion Radio Transceivers for Digital Communications*, IEEE J. of Solid-State Circuits, 30(12):1399-1410 (Dec. 1995) ("Abidi") |
| V | Request for Reexamination and Response to the Final Rejection Dated 06/07/10, Application No. 12/570,343 |

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

– v –

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

## I.    INTRODUCTION

Plaintiff One-E-Way, Inc. ("OEW") parlayed a two-page patent application into a series of patents that it asserts are infringed by any mobile device that can transmit or receive audio over Bluetooth.  But the claims are much narrower.  The patents address the problem that existing audio players needed a wired connection from their headphone audio jacks in order to provide private audio to a user.  To solve that problem, the purported invention uses a transmitter that can connect into the headphone jack of any existing audio player to provide for wireless private listening.

Apple's proposed constructions are correct, well-supported, and faithful to the record.  OEW, by contrast, runs away from the teachings of its patents and the ordinary meanings of the words in the claims.  OEW also misuses the prosecution history.  It ignores its disavowal of claim scope to distinguish the prior art while citing its own self-serving proclamations that misstate the patents' disclosures.  However, arguments made in prosecution cannot enlarge the content of the specification.

## II.    BACKGROUND AND OVERVIEW

OEW asserts three patents that share a written description filed in August 2003 and purport to claim priority to an application filed in December 2001 (Ex. A, "'196 app.").  This brief cites the '391 patent specification for content that is common to all three patents.  All textual emphasis is added unless otherwise noted.

The patents' shared specification is highly instructive regarding the problem purportedly solved by the patented "invention."  The patents start the "Background of the Invention" section by summarizing "[t]his invention":

> This invention relates to audio player devices and more particularly to systems that include headphone listening devices. The new audio system uses an existing headphone jack (i.e., this is the standard analog headphone jack that connects to wired headphones) of a music audio player (i.e., portable CD player, portable cassette player, portable A.M./F.M. radio, laptop/desktop computer, portable MP3 player, and the like) to connect a battery powered transmitter for wireless transmission of a signal to a set of battery powered receiving headphones.

'391, col. 1:19-28; *cf.* '196 app., [0001].  The specification continues by discussing

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

1

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

the deficiencies and needs in the prior art that the invention purports to address:

> Use of audio headphones with audio player devices such as portable CD players, portable cassette players, portable A.M./F.M. radios, laptop/desktop computers, portable MP3 players and the like have been in use for many years. These systems incorporate an audio source having an analog headphone jack to which headphones may be connected by wire.
>
> There are also known wireless headphones that may receive A.M. and F.M. radio transmissions. However, they do not allow use of a simple plug in (i.e., plug in to the existing analog audio headphone jack) battery powered transmitter for connection to any music audio player device jack, such as the above mentioned music audio player devices, for coded wireless transmission and reception by headphones of audio music for private listening without interference where multiple users occupying the same space are operating wireless transmission devices. Existing audio systems make use of electrical wire connections between the audio source and the headphones to accomplish private listening to multiple users.
>
> There is a need for a battery powered simple connection system for existing music audio player devices (i.e., the previously mentioned music devices), to allow coded digital wireless transmission (using a battery powered transmitter) to a headphone receiver (using a battery powered receiver headphones) that accomplishes private listening to multiple users occupying the same space without the use of wires.

'391, col. 1:29-53; *cf.* '196 app., [0002]-[0004].   The patents' "Summary of the Invention" summarizes the "present invention":

> The present invention is generally directed to a wireless digital audio system for coded digital transmission of an audio signal from any audio player with an analog headphone jack to a receiver headphone located away from the audio player. Fuzzy logic technology may be utilized by the system to enhance bit detection. A battery-powered digital transmitter may include a headphone plug in communication with any suitable music audio source. For reception, a battery-powered headphone receiver may use embedded fuzzy logic to enhance user code bit detection. Fuzzy logic detection may be used to enhance user code bit detection during decoding of the transmitted audio signal. The wireless digital audio music system provides private listening without interference from other users or wireless devices and without the use of conventional cable connections.
>
> These and other features, aspects and advantages of the present invention will become better understood with reference to the following drawings, description and claims.

'391, col. 1:57-2:7.

OEW's prior litigation resulted in a claim construction decision by an ITC administrative law judge in July 2015. Ex. B.   Apple and OEW have stipulated to

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

2

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

certain of those constructions. Dkt. 63 at 1-2. Only one term that was construed at the ITC is disputed here: the "direct conversion module . . ." elements.

## III. ARGUMENT

### A. "audio player," "audio source," and "transmitter"

| Term | Plaintiff's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "audio player" | Plain and ordinary meaning | a device for playing audio that has an analog headphone jack |
| "audio source" | Plain and ordinary meaning | a device for providing audio that has an analog headphone jack |
| "transmitter" | Plain and ordinary meaning | a device that can be connected into an analog headphone jack to wirelessly transmit an audio signal |

The specification dictates specific narrow meanings for the terms "audio player," "audio source," and "transmitter." The patents are limited to a system for use with audio players/sources with analog headphone jacks. The specification explains that such audio player/source devices were known in the art:

> Use of audio headphones with audio player devices such as portable CD players, portable cassette players, portable A.M./F.M. radios, laptop/desktop computers, portable MP3 players and the like have been in use for many years. *These systems incorporate an audio source having an analog headphone jack* to which headphones may be connected by wire.

'391, col. 1:29-34. As discussed further below, the specification both (1) teaches that the "invention" itself—not merely an embodiment—provides a transmitter that can connect into the headphone jack of an audio player/source, and (2) distinguishes the prior art on that basis, thereby disclaiming any broader meaning.

Claims "must be read in view of the specification, of which they are a part." *SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1317 (Fed. Cir. 2015) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc)). Where the specification "has manifested that the invention does or does not include a particular aspect," that disclosure is "dispositive" and "the inventor has 'disavowed' claim

Cooley LLP
Attorneys at Law
Palo Alto

3

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

scope." *Techtronic Indus. Co. v. Int'l Trade Comm'n*, 944 F.3d 901, 907 (Fed. Cir. 2019) (citation omitted). "A disavowal must be clear, but it need not be explicit" and "may be inferred from clear limiting descriptions of the invention in the specification . . . ." *Id.* (citations omitted). A "patent applicant need not expressly state 'my invention does not include X' to indicate his exclusion of X from the scope of his patent . . . ." *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016). In this way, an "implied disclaimer" may occur "by implication." *SightSound*, 809 F.3d at 1317 (citations omitted).

Two types of disavowal apply here. First, when the specification "describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 933 (Fed. Cir. 2019) (citation omitted). "It is axiomatic that, where the specification 'describes "the present invention" as having [a] feature,' that representation may disavow contrary embodiments." *Techtronic*, 944 F.3d at 907-08 (quoting *Poly-America, L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) ("[A]n inventor may disavow claims lacking a particular feature when the specification describes 'the present invention' as having that feature." (citation omitted))). Second, "[a]n inventor may also disavow claim scope 'by distinguishing the claimed invention over the prior art.'" *Techtronic*, 944 F.3d at 907 (citation omitted); *Poly-America*, 839 F.3d at 1136 ("an inventor may disavow claims lacking a particular feature when the specification distinguishes or disparages prior art based on the absence of that feature").

Either form of disclaimer, by itself, narrows the claims. *Techtronic*, 944 F.3d at 906-07; *Poly-America*, 839 F.3d at 1136-37. In this case, both types are present.

First, the specification states that the "invention" itself—not merely an example embodiment—"uses an existing headphone jack" of "any audio player with an analog headphone jack" to connect to a "transmitter" for wireless transmission:

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

4

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

1
2
3
4
5

> ***This invention*** relates to ***audio player*** devices and more particularly to systems that include headphone listening devices. ***The new audio system uses an existing headphone jack*** (i.e., this is the standard analog headphone jack that connects to wired headphones) ***of a music audio player*** (i.e., portable CD player, portable cassette player, portable A.M./F.M. radio, laptop/desktop computer, portable MP3 player, and the like) ***to connect a battery powered transmitter*** for wireless transmission of a signal to a set of battery powered receiving headphones.

6

'391, col. 1:19-28.

7
8
9

> ***The present invention*** is generally directed to a wireless digital audio system for coded digital transmission of an audio signal from ***any audio player with an analog headphone jack*** to a receiver headphone located away from the audio player. . . . ***These and*** other features, aspects and advantages of ***the present invention*** will become better understood with reference to the following drawings, description and claims.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Id.* at 1:57-2:7.  The Federal Circuit consistently relies on similar statements to find disclaimer.  "These statements about the invention are not limited to specific embodiments or examples but describe and define the invention overall." *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1321-22 (Fed. Cir. 2011) (finding disclaimer based on specification's description of the "invention"); *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370-71 (Fed. Cir. 2016) (construing "node" to require that a node "operates independently from a telephone network" based on "only one sentence" in the specification stating that "the invention provides a two-way paging system which operates independently from a telephone system for wireless data communication between users") (emphasis omitted); *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 935-36 (Fed. Cir. 2013) (construing claims to require two separate disks based on paragraph introducing the "present invention" followed by description of "[t]he instant closure device"—"[t]he present invention provides a simple, reliable device for effectively occluding a septal defect. The instant closure device includes first and second occluding disks which are attached to one another. . . ."); *Forest Labs.*, 918 F.3d at 933 (limiting claim to buccal or sublingual formulations where specification stated that "[t]he invention relates to a sublingual or buccal pharmaceutical composition" (citation omitted)); *Poly-America*, 839 F.3d at 1136

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

5

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

(limiting the term "short seal" to require inward extension where the specification described "extended short seals" as a characteristic of "the present invention").

Second, the patents specifically distinguish and disparage the prior art on the basis that the prior art relied on wired connections with the "audio source" or "audio player" and failed to provide a transmitter to plug in to an existing audio player headphone jack for wireless private listening:

> There are also known wireless headphones that may receive A.M. and F.M. radio transmissions. However, ***they do not allow use of a simple plug in (i.e., plug in to the existing analog audio headphone jack) battery powered transmitter for connection to any music audio player device jack, such as the above mentioned music audio player devices***, for coded wireless transmission and reception by headphones of audio music for private listening without interference where multiple users occupying the same space are operating wireless transmission devices. ***Existing audio systems make use of electrical wire connections between the audio source and the headphones to accomplish private listening*** to multiple users.
>
> ***There is a need for a battery powered simple connection system for existing music audio player devices (i.e., the previously mentioned music devices)***, to allow coded digital wireless transmission (***using a battery powered transmitter***) to a headphone receiver (using a battery powered receiver headphones) that accomplishes private listening to multiple users occupying the same space without the use of wires.

'391, col. 1:35-53. The specification thus confirms that the invention requires (1) an audio player/source with a headphone jack and (2) a transmitter that can connect into that jack. *SightSound*, 809 F.3d at 1317 (construing "second memory" to exclude records, tapes, and CDs because "[t]he disadvantages identified by the specification of records, tapes, and CDs amount to implied disclaimer of those three media."); *Poly-America*, 839 F.3d at 1136 (construing "short seal" to require inward extension where specification stated that "prior art bags are difficult to secure over trash receptacle lips and explaining that the use of extended short seals reduces the claimed bag's upper opening, making it easy to fit around a trashcan."); *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1149-50 (Fed. Cir. 2012) (construing "electrochemical sensor" to exclude cables and wires because the specification disparaged "the external cables and wires of the prior-art sensors").

Cooley LLP
Attorneys at Law
Palo Alto

6

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

1    These limitations are "necessary to
2  tether the claims to what the specification
3  indicates the inventor actually invented."
4  *Meds. Co. v. Mylan, Inc.*, 853 F.3d 1296,
5  1309 (Fed. Cir. 2017) (citation, internal
6  quotation marks, and brackets omitted).
7  The rest of the specification is consistent.
8  The only disclosed embodiment provides a



9  transmitter that connects into the headphone jack of an audio player/source.[1]   The
10  system is shown in Figure 1, which "illustrates a wireless digital audio system ***in***
11  ***accordance with the present invention***."   '391, col. 2:11-14.[2]   Figure 1 shows
12  "battery powered transmitter **20** connected to a portable music audio player or music
13  audio source **80**" through "analog headphone jack **82**."  *Id*. at 2:30-36, Fig. 1.

14    The specification also shows in Figure 2 internal components connecting the
15  audio player/source **80** to a spread-spectrum "transmitter or module **48**" inside
16  transmitter **20**.  '391, col. 2:45-53, Fig. 2.  Nowhere does the specification disclose
17  any embodiment including (1) an audio player/source without a headphone jack, or
18  (2) a transmitter that cannot be connected into existing headphone jacks. *Abbott*, 696
19  F.3d at 1150 (finding disclaimer where the "patents repeatedly, consistently, and
20  exclusively depict an electrochemical sensor without external cables or wires while
21  simultaneously disparaging sensors with external cables or wires" (citation and
22  internal quotation marks omitted)).

23  _____

[1] The patents recite "audio player" and "audio source" interchangeably. *E.g.*, '391, Abstract ("audio source"), cols. 1:23 ("audio player"), 1:29-34 ("audio player devices" and "audio source having an analog headphone jack"), 1:57-61 ("audio player"), 1:63-64 ("audio source"), 2:32-33 (describing that item **80** in the disclosed embodiment is portable "music audio player or music audio source **80**"); '391, claims 3, 4, 5 ("player"); '627, claim 5 ("player"); '047, claims 1, 8 ("source"); '627, claim 1 ("source"); Ex. M at 4 (One-E-Way noting that amending claims from "audio source" to "audio player" "does not change the scope of the claims").
[2] By contrast, when describing Figure 4 with an optional "fuzzy logic" technique, the specification states that Figure 4 is merely an "exemplary" graph showing an algorithm "according to one embodiment of the present invention." *Id*. at 2:19-21.

The specification further explains that the headphone receiver can work with any of the previously-identified existing prior art audio devices: "Each receiver headphone **50** user may be able to listen (privately) to high fidelity audio music, ***using any of the audio devices listed previously***, without the use of wires . . . ." '391, col. 3:32-36. The only way the system can use those existing devices for private wireless listening is that the transmitter can be connected into their headphone jacks. *Regents of Univ. of Minn.*, 717 F.3d at 936 (finding disclaimer requiring distinct disks in view of specification embodiment with "a configuration that can only make sense if the disk membranes are separate, physically distinct structures") (citation omitted).

To be clear, while the invention requires a transmitter that can be connected into the headphone jack, the transmitter itself need not include a headphone plug. The transmitter could connect into the jack in other ways, directly or indirectly. *See* '391, cols. 1:62-64, 2:33-36. For example, it could be connected only indirectly through a separate wire. In fact, that is the design of OEW's "patented" E-Clip Air Wireless Transmitter, which is shown in the graphics reproduced below.



The claim language is consistent with these meanings. The claims recite a "transmitter operatively coupled to said audio player," "transmitter coupled to a music audio source," "transmitter operatively coupled to a portable audio player," and the like. *See* '391, claims 1, 3-6, 10; '047, claims 1, 8, 17; '627, claims 1, 3, 5. The claims never recite that any audio player/source does not have a headphone jack and never recite that any transmitter cannot be connected into a headphone jack.

The prosecution history does not require any broader meaning. On the

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

8

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

contrary, the Examiner who allowed the '047 patent understood the claimed "transmitter" to be a separate device connected into a jack of the claimed "audio source" and allowed the claims over the prior art specifically on that basis:

> The prior art of record fails to explicitly disclose or make obvious the limitations presented in Applicant's claims 1, 8 and 17. Specifically, in claims 1, 8 and 17, the claimed invention is drawn to a portable audio receiver and/or a portable transmitter wirelessly communicating audio from a music audio source (Fig. 1, 20, 80 and 55). The receiver is depicted as a set of wireless, battery powered headphones (see, for example, paras 5, Fig. 1, element 55). ***The transmitter is depicted as a portable battery powered transmitter operably connected to the music audio source through the user of a plug/jack configuration*** (see Fig. 1, elements 20 and 80). The receiver and transmitter, are depicted as being in close proximity, as noted in paras 3, 4, detailing users of the system occupying the same space and ***improvements over existing systems using wires*** (wires in headphones indicating close proximity).

> Given ***the above construction of the claimed portable audio transmitter and portable audio receiver and music audio source***, the prior art of record fails to explicitly disclose or make obvious the claimed limitations in this particular field.

Ex. C at 6-7.  While an examiner's comments do not necessarily define the claims, they illustrate this Examiner's objective understanding of the disclosed invention.

In response to the Examiner's notice of allowance, OEW's counsel submitted self-serving statements suggesting that they desired a broader claim scope.  *See* Ex. D.  However, OEW did not request that the Examiner reevaluate the claims over the prior art using any broader construction.  Moreover, OEW's self-serving statements cannot broaden the specification's clear teachings.  "Where, as here, the written description clearly identifies what his invention is, an expression by a patentee during prosecution that he intends his claims to cover more than what his specification discloses is entitled to little weight."  *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1319 (Fed. Cir. 2006).  "Representations during prosecution cannot enlarge the content of the specification."  *Id.* (citation omitted).

**B.    "receiver"**

| Plaintiff's Proposed Construction | Apple's Proposed Construction |
|---|---|
| Plain and ordinary meaning | a device that receives and converts signals |

Cooley LLP
Attorneys at Law
Palo Alto

9

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

The parties dispute whether the claimed "receiver" should be construed with its ordinary meaning reflected in the patents, as Apple proposes, or improperly broadened to encompass multiple separate receiver devices, as OEW contends.

The patents use the term "receiver" consistent with its ordinary meaning. The claim language recites "a . . . receiver" (for example, "a portable digital audio headphone receiver" "a wireless digital audio spread spectrum receiver," and the like) configured to perform various functions. *See*, *e.g.*, '391, claims 1, 3-6, 10; '047, claims 1, 8; '627, claims 1, 3, 5. The specification describes a "battery powered receiver **50**" (or "headphone receiver **50**") that receives and converts signals. '391, col. 2:36-45. The specification also states that receiver **50** contains components including a "direct conversion receiver or module **56**" (which is addressed further below) that receives and converts signals. *Id.*, col. 2:66-3:13.

The patents thus use the term "receiver" consistent with its ordinary meaning at the time of the purported invention, as reflected in dictionary definitions from the time. Ex. E ("receiver . . . *a device* employed to translate an incoming signal from the communications channel to a format suitable for a user's recording device, action, or for further transmission."); Ex. F ("receiver . . . *A device*, as part of a radio or telephone, that receives incoming electromagnetic signals and converts them to perceptible forms."); Ex. G ("receiver . . . *a device* that converts electrical waves or signals into audible or visual signals"). *Starhome GmbH v AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014) ("dictionaries and treatises can often be useful in claim construction, particularly insofar as they help the court to better understand the underlying technology and the way in which one of skill in the art might use the claim terms." (citation and internal quotation marks omitted)); *id.* (relying on dictionaries to determine that the "term 'gateway' had a well-understood meaning in the art at the time . . . ."). OEW has not identified any inaccuracy in Apple's proposed construction and has not disputed that it reflects the ordinary meaning of the term "receiver."

Cooley LLP
ATTORNEYS AT LAW
PALO ALTO

10

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

The dispute arises from OEW's baseless contention that the claimed "receiver" may encompass multiple distinct receiver devices. For example, Apple's AirPods products include a left earbud, right earbud, and charging case—but OEW contends that the entire set of components "is a . . . receiver." Nothing in the intrinsic evidence supports OEW's desired departure from the ordinary meaning of "receiver."

### C.    "headphone"

| Plaintiff's Proposed Construction | Apple's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | a device with speaker(s) secured by a band placed over the head |

The term "headphone" should be construed with its ordinary meaning at the time of the claimed invention, as shown in the patents: a device with speaker(s) secured by a band placed over the head. OEW improperly seeks to broaden the term to cover in-ear wireless earpieces that would not have been considered a "headphone," as claimed, at the time.

Starting with the claim language, the term "headphone" suggests its own meaning: a "head" phone is something that is secured to the user's head. The claims never recite that the claimed "headphone" consists only of in-ear earpieces that are not secured over the head. *See* '391, claims 1, 3, 6, 10. The specification likewise describes a "headphone" that is a device with speakers secured by a band placed over the head, as shown in Figure 1 of the patents. *See* '391, col. 2:39-45, Fig. 1. The specification does not disclose any other embodiment of a headphone.

The specification's disclosure is consistent with the customary meaning of the term at the relevant time, as reflected in dictionaries. *Starhome*, 743 F.3d at 856 ("judges are free to rely on dictionaries at any time during the process of construing claims so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." (citation and internal quotation marks omitted)). *See* Ex. H ("headphone . . . An electroacoustic transducer designed to be held against an ear by a clamp passing over the head . . . ."); Ex. G

Cooley LLP
Attorneys at Law
Palo Alto

11

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

1  ("headphone . . . a listening device for a radio, stereo, etc. worn over the head to
2  position its tiny speakers over the ears"); Ex. F ("headphone . . . A receiver held to
3  the ear by a headband.").[3]  Considering the term "in the context of the claims and
4  specification . . . one of ordinary skill would have understood that the inventor[] did
5  not depart from the ordinary meaning . . . ." *Starhome*, 743 F.3d at 856-57.

6      One-E-Way incorrectly contends that the claimed "headphone" covers
7  separate in-ear earpieces.  OEW points to Apple's recent description of AirPods
8  products.  But Apple's introduction of a new product in 2016 cannot change the
9  meaning of the term "headphone" many years earlier when the patents were filed.
10  Indeed, this point only illustrates why the term "headphone" should be construed.

11      OEW cites some dependent claims that recite features such as headphone
12  straps, but the Federal Circuit routinely rejects such attempts by patentees to
13  improperly broaden claim scope through "claim differentiation" arguments.  *Poly-*
14  *America*, 839 F.3d at 1137 (rejecting patentee's argument that "because other
15  independent and dependent claims explicitly provide for reduced upper opening
16  width, claim differentiation principles preclude importing that limitation into claim
17  10, which does not contain such an explicit limitation."); *Edwards Lifesciences LLC*
18  *v. Cook Inc.*, 582 F.3d 1322, 1330 (Fed. Cir. 2009) (rejecting "claim differentiation"
19  argument, even if the correct claim construction "rendered the dependent claim
20  redundant"); *Intell. Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1326
21  (Fed. Cir. 2017) (rejecting claim differentiation argument).

22      OEW also points to two immaterial third-party patents that do not change the
23  analysis.  The Federal Circuit endorses consulting authoritative texts such as
24  "dictionaries and treatises" in claim construction when they reflect meanings
25  consistent with the intrinsic evidence.  *Starhome*, 743 F.3d at 856-57; *Phillips*, 415

26

---

27  [3] A "headphone" was sometimes contrasted with an "earphone."  *E.g.*, Ex. I
   ("headphones . . . an electrical device consisting of two earphones held in position
28  by a flexible metallic strap passing over the head."); Ex. J at 7, 16, 24, 26, 29
   (contrasting "headphones or earphones" and "headphones/earphones").

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

12

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

1   F.3d at 1318 ("Within the class of extrinsic evidence, the court has observed that
2   dictionaries and treatises can be useful in claim construction.").  By contrast, OEW
3   seeks to contradict the meaning taught in its patents with third-party documents that
4   are precisely the type of cherry-picked, unreliable, "marginal," and non-authoritative
5   "fluff" that the Federal Circuit warns against.  *Phillips*, 415 F.3d at 1318-19.

### D.    "direct" communication / "directly" communicate

| Plaintiff's Proposed Construction | Apple's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "direct" communication: one-to-one communication<br>"directly" communicable: in one-to-one communication |

10  The asserted '391 claims recite that the receiver is configured for "*direct*"
11  communication with, or "*directly*" communicable with, the transmitter.  *See* '391,
12  claims 1, 3-6, and 10.  Based on OEW's statements in prosecution, this means that
13  the receiver and transmitter are in "one-to-one" communication.

14  The issue first arose during prosecution when OEW sought to amend certain
15  claims to add that the receiver is "directly" communicable with the transmitter.  Ex.
16  K at 3.  The Examiner declined to enter the amendment and stated as follows:

> Claims 3-6, 10 and 12 now require the receiver to be directly
> communicable with a mobile audio transmitter.  Previously they were
> only communicable, no direct requirement was present.  The previous
> interpretation allowed for intermittent steps during communication
> while the new limitations preclude this interpretation and thus are a
> change in scope.

20  Ex. L.  OEW subsequently relied on the recitation of the transmitter and receiver
21  being in "*direct*" communication or "*directly*" communicable in order to distinguish
22  the prior art.  In particular, the Examiner rejected the pending claims based on prior
23  art to Alstatt and Li.  In response, OEW distinguished its claims over the prior art
24  because the claims require only "a single mobile transmitter and a single mobile
25  receiver" (with no other communication devices, such as a base station) for
26  communication "directly between one transmitter and one receiver."  OEW first
27  explained how its claimed invention involves a "*direct one-to-one*" or "*one-to-one*
28  *direct*" communication link:

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

13

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

As is outlined in detail below, the prior art in combination do not teach or suggest ***the present invention*** and provide no motivation for one of ordinary skill to combine and solve the novel problems posed by a mobile system working with ***a single mobile transmitter and a single mobile receiver*** in a space containing other transmissions in the digital wireless spectrum.

Li teaches the necessity of intermediate links, such as, a base station to transmit wireless digital audio, thus removing the Li/Altstatt combination that is cited for teaching a base device in the combination's wireless CDMA headphone set. The Reed-Solomon technique of reducing interference is inapplicable and founded on a disparate approach to reducing interference, removing Lindemann as prior art for teaching the reduction of intersymbol interference in a comparable device. Thus, there is nothing predictable about the present invention's functioning of high fidelity transmission and reception of digital audio ***directly between one transmitter and one receiver*** in the presence of other users, and the rejections should be removed (see page 16 of the OA). . . .

However, the combination of Altstatt and Li does not teach or suggest ***the present invention***. This has been discussed previously, for example, on page 2 of the August 4, 2010 of the Applicant's response to the Final Rejection dated 06/07/2010. The Examiner understands that Altstatt does not disclose a ***direct one-to-one*** digital transmitter-to-headphone communication link, thus, it should also be understood that Altstatt cannot realize the benefits of such a digital link as asserted. Moreover, Li clearly discloses a cellular communication system. A CDMA cellular network is a time-synchronous system that requires intermediate links (not a ***one-to-one direct*** link), for example, a cell phone tower between end-to-end transmission and reception to suppress interference.

Ex. N at 4-6.   OEW further confirmed that "*direct*" communication between the transmitter and receiver entails a "*one-to-one*" communication link:

> ***Claims 1-4 and 8-18 of the present invention*** specifically disclose a ***direct one-to-one*** transmitter/receiver communication link [footnote 9] that the Altstatt/Li combination cannot teach or suggest. [Footnote 9: For example, the in-motion transmitter/in-motion receiver embodiment language of Claim 2: 'a digital audio receiver, capable of mobile operation, configured for ***direct*** digital wireless spread spectrum communication with a mobile digital audio transmitter."] A close review of Altstatt/Li combination reveals that intermediate equipment (or steps) is required for the transmitter and headphone receiver to communicate. For example, the Altstatt/Li system must wirelessly transmit audio (Altstatt) to, at least, a base station and/or a cell phone tower (Li) prior to the receiver headphone receiving the audio.

*Id*. at 7 & n.9.   Finally, OEW reconfirmed that the claim language of "direct communication" or "directly communicable" requires a "one-to-one" architecture:

Cooley LLP
Attorneys at Law
Palo Alto

14

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

The Examiner has approved this language in the past. Item 3 of the Advisory Action dated 07/27/2011 submits that ***the language of "direct communication" (or "directly communicable") adheres to a one-to-one architecture embodiment***.

*Id*. at 7 & n.9.  The Examiner then allowed the claims.

This is a classic case of prosecution disclaimer.  "An applicant's statements to the PTO characterizing its invention may give rise to prosecution disclaimer." *Tech. Props. Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1357-58 (Fed. Cir. 2017).  "A patentee may, through a clear and unmistakable disavowal in the prosecution history, surrender certain claim scope . . . ." *SpeedTrack, Inc. v. Amazon.com, Inc.*, 998 F.3d 1373, 1377-78 (Fed. Cir. 2021).  "A patentee must be held to what he declares during the prosecution of his patent, because a contrary rule would undermine the public notice function of a patent." *Ajinomoto Co. v. Int'l Trade Comm'n*, 932 F.3d 1342, 1351 (Fed. Cir. 2019) (citation and internal quotation marks omitted).  Here, OEW repeatedly distinguished its claimed invention from the prior art on the basis that "direct" communication, as claimed, is "one-to-one."  OEW is held to its disclaimer even if it may have "surrendered more than may have been necessary" to distinguish the prior art.  *Ajinomoto*, 932 F.3d at 1351.

The claim language and specification are consistent.  The claims recite a receiver for "direct" communication (or "directly" communicable) with a transmitter.  '391, claims 1, 3-6, and 10.  The claims do not recite any "one-to-many" communications.  The specification describes that a transmitter communicates with only one headphone receiver, using a "unique user code" that is the "only code recognized by" the receiver.  '391, col. 2:54-59.

OEW asks the Court to disregard its statements during prosecution and leave the claim language to "plain and ordinary meaning."  However, OEW improperly seeks to stretch its claims to cover communication that is *not* one-to-one, such as communication with multiple receiver devices.  OEW "must be held to what [it]

Cooley LLP
ATTORNEYS AT LAW
PALO ALTO

15

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

declare[d] during the prosecution." *Ajinomoto*, 932 F.3d at 1351 (citation and internal quotation marks omitted).

### E.    "module adapted to reproduce said generated audio output"

| Plaintiff's Proposed Construction | Apple's Proposed Construction |
|---|---|
| Plain and ordinary meaning | <u>Function</u>: reproduce said generated audio output<br><u>Structure</u>: headphone speakers 75 |

The asserted '391 claims recite a digital-to-analog converter for generating an audio output and a "module adapted to reproduce said generated audio output." '391, claims 1, 3-6, 10. The "module adapted to reproduce said generated audio output" is a means-plus-function element under *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc).[4]

If a claim element does not recite the word "means," there is a rebuttable presumption that it is not a means-plus-function element. *Id*. at 1348. However, the presumption is not "strong," and it is overcome if the claim language either (1) fails to "recite sufficiently definite structure," or (2) recites "function without reciting sufficient structure for performing that function." *Id*. at 1349 (citation omitted).

"One way to demonstrate that a claim limitation fails to recite sufficiently definite structure is to show that, although not employing the word 'means,' the claim limitation uses a similar nonce word that can operate as a substitute for 'means' in the context of § 112, para. 6." *MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1341 (Fed. Cir. 2019) (citation and internal quotation marks omitted). In *Williamson*, the Federal Circuit held that the term "[m]odule" "is a well-known nonce word that can operate as a substitute for 'means' in the context of § 112, para. 6." 792 F.3d at 1350 (the word "'module' is simply a generic description for software or hardware that performs a specified function" (citation omitted)). "Generic terms like 'module,' 'mechanism,' 'element,' and 'device' are commonly used as verbal constructs that

---

[4] At the ITC, none of the parties argued for means-plus-function construction and *Williamson* changed the law after they submitted their briefs.

Cooley LLP
Attorneys at Law
Palo Alto

16

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

operate, like 'means,' to claim a particular function rather than describe a 'sufficiently definite structure.'" *MTD Prods.*, 933 F.3d at 1341 (citation omitted); *Farstone Tech., Inc. v. Apple Inc.*, No. 8:13-cv-1537-ODW(JEMx), 2015 WL 5898273, at *3-4 (C.D. Cal. Oct. 8, 2015) (construing "backup/recovery module").

In this case, the claimed "module adapted to reproduce said generated audio output" both (1) fails to recite sufficiently definite structure and (2) recites function ("reproduce said generated audio output") without reciting sufficient structure for performing that function.[5]  As in *Williamson*, "the word 'module' does not provide any indication of structure because it sets forth the same black box recitation of structure for providing the same specified function as if the term 'means' had been used."  792 F.3d at 1350.  The word "module" is only a placeholder for some unspecified "software or hardware that performs a specified function"—here, the function of reproducing the generated audio output.  *Id.*; *Rain Computing*, 989 F.3d at 1006 ("'module' here does not provide any indication of structure . . . .").

Nothing in the record compels a different conclusion.  A person of ordinary skill in the art would have understood that the term "module" is a generic nonce word here just as the Federal Circuit routinely holds in electronics and communications contexts.  Declaration of Dr. Christopher Hansen, Ph.D ("Hansen Decl."), ¶¶ 22-26.  Other extrinsic evidence further confirms this point.  For example, the Federal Glossary of Telecommunication Terms defines "module" as a generic term for a hardware or software components: "1. An interchangeable subassembly that constitutes part of, *i.e.*, is integrated into, a larger device or system. 2. In computer programming, a program unit that is discrete and identifiable with respect to

---

[5] Under the *Williamson* test, it is immaterial that the claim language uses the phrase "adapted to" instead of the word "for."  *E.g.*, *MTD Prods.*, 933 F.3d at 1343-45 (means-plus-function construction for "mechanical control assembly . . . that is configured to" perform a function); *Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*, 989 F.3d 1002, 1004-06 (Fed. Cir. 2021) (means-plus-function construction for "user identification module configured to control access . . . ."); *Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*, 958 F.3d 1348, 1356 (Fed. Cir. 2020) ("the claim term 'adapted to' generally means 'made to,' 'designed to,' or 'configured to' perform the stated function . . . ." (citations omitted)).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

17

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

compiling, combining with other modules, and loading." Ex. O at M-14.[6] The claim language does not specify a particular structure for achieving the stated function to "reproduce said generated audio output." And "the specification does not impart any structural significance to the term; in fact, it does not even mention" any explicit function of reproducing generated audio output. *Rain Computing*, 989 F.3d at 1006.

Since the term is a means-plus-function element, the next two steps in claim construction are to (1) "identify the claimed function" and (2) "determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Rain Computing*, 989 F.3d at 1007 (citation omitted). Here, the function as stated in the claim is "reproduce said generated audio output." The only structure disclosed in the specification that corresponds to this function is headphone speaker(s) **75**. In context, the claims recite a digital-to-analog converter to generate an audio output of an audio signal representation, followed by the "module adapted to reproduce said generated audio output." *See* '391, claims 1, 3-6, 10. The specification likewise describes that the headphone contains "[a] digital-to-analog converter **70** (DAC) may be used to transform the digital signal to an analog audio signal." '391, col. 4:17-20. After filtering by a low pass filter **72** and processing by a power amplifier **74**, the audio is played to the user by headphone speakers **75**. '391, col. 4:21-28. The headphone speakers **75** correspond to the function of reproducing the audio output generated by the digital-to-analog converter, as claimed. Hansen Decl., ¶ 27.

### F.    "direct conversion module . . ."

| Plaintiff's Proposed Construction | Apple's Proposed Construction |
|---|---|
| module for converting radio frequency to baseband or very near baseband in a single frequency | Function: (1) "direct conversion" and (2) "capture packets and the correct bit sequence . . ." (*e.g.*, '391 claim 1) (*see* Dkt. 63 at 6-13 for full list of functions) Structure: direct conversion receiver or module 56 |

---

[6] OEW also cites a book discussing use of a "module chart" to assign physical locations to integrated circuits, which does not change the analysis. The claims here, including the "module" elements, are not necessarily limited to an integrated circuit.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

18

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

| conversion without an intermediate frequency | "direct conversion" means "conversion from radio frequency to baseband in a single frequency conversion without an intermediate frequency" |
|---|---|

### 1.    The "direct conversion module . . ." elements are means-plus-function elements.

Each "direct conversion module . . ." element recites multiple functions including (1) the prefatory function of "direct conversion" and (2) the recited function that follows the word "module" in each claim. *See* Dkt. 63 at 6-13. Each element is a means-plus-function element because it uses the nonce word "module" and "fails to recite sufficiently definite structure" for performing the recited functions.[7] *MTD Prods.*, 933 F.3d at 1341; *Rain Computing*, 989 F.3d at 1006 ("the purely functional claim language reciting what the 'user identification module' is configured to do provides no structure."). Hansen Decl., ¶¶ 28-31, 57.

While "direct conversion" had a known meaning in the field, as discussed further below, the claims recite additional functions such as "*capture packets and the correct bit sequence within the packets aided by lowering signal detection error through reduced intersymbol interference coding . . .*" and other functions. *Id.*, ¶¶ 28, 57. Thus, even assuming *arguendo* that "direct conversion module" connoted a specific structure, a generic "off the shelf" direct conversion receiver, by itself, would not be sufficient "structure for performing *the claimed function*" as recited in each claim because each claimed function would have required additional programming and configuration. *Rain Computing*, 989 F.3d at 1006; Hansen Decl., ¶ 57.

Under means-plus-function treatment, the corresponding structure is "direct conversion receiver or module **56**." '391, col. 2:64-3:13; Hansen Decl., ¶ 50.

### 2.    The function of "direct conversion" requires a single down conversion to baseband.

The function of direct conversion had a well-established meaning in this

---

[7] *See supra* note 4. In addition regarding "direct conversion module," the parties did not submit expert opinions and the ALJ erred by accepting OEW's mischaracterization of the Dobkin reference. Hansen Decl., ¶¶ 39-40.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

19

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

context before the patents were filed. "Baseband" refers to the original frequency range of a transmission signal before it is modulated for transmission. Hansen Decl., ¶ 32. For example, an audio signal that a human can hear may have a baseband frequency range between 20 Hz to 20 kHz. When a signal is transmitted on a radio frequency ("RF"), the signal is modulated to a much higher frequency range (inaudible to humans), such as 2.4 GHz. After the transmitted signal is received by a receiver, the RF frequency range is typically down-converted either to baseband or to an "intermediate frequency" ("IF") that is not baseband. *Id*.

Multiple different down conversion techniques were well-known in the field. One technique was "***direct conversion***," also sometimes called "zero-IF" or "homodyne," where the received "RF signals are converted to baseband in a single step." Ex. P (Dobkin) at 112; Ex. Q (Mashhour) ("directly converting the signal to baseband"); Ex. R (Gilb) at 5 ("the RF signal is mixed directly to baseband"); Ex. S (Razavi) at 129 (in direct-conversion, the RF spectrum is "translated to the baseband in the first downconversion"); Ex. T (Sullivan) at 1 ("[d]irectly down converting from RF to baseband" using "a single local oscillator"); Ex. U (Abidi) at 1401 ("This zero-IF scheme is also called direct-conversion"). Hansen Decl., ¶¶ 33-45.

Direct conversion contrasted with different techniques that down converted from RF to an IF different from baseband, including "low IF" and "near-zero IF" techniques. *See* Ex. P (Dobkin) at 112 (distinguishing "direct conversion" versus "near-zero IF" as "[t]wo . . . alternatives"); Ex. Q (Mashhour) at 4 (distinguishing direct conversion – "directly converting the signal to baseband" – versus a "Low IF single conversion" technique); Ex. R (Gilb) at 4-5 (distinguishing "Low IF" and "Very Low IF" techniques from direct conversion). Hansen Decl., ¶¶ 33-45. There were various technical reasons to use these different options for down conversion in view of considerations such as cost, complexity, and power consumption. *Id.*, ¶ 35.

The asserted patents and claims contemplate only "direct conversion," which is performed by a "direct conversion receiver or module" in the disclosed

Cooley LLP
ATTORNEYS AT LAW
PALO ALTO

20

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

embodiment. '391, col. 2:64-3:13. The specification never describes any down conversion to an IF, down conversion to "near baseband," or any capability for providing both direct conversion and near-zero IF conversion. A person of ordinary skill in the art would have understood that by referring to "direct conversion," the written description and claims simply reference the well-known function of directly down converting from RF to baseband in a single step. Hansen Decl., ¶¶ 46-49.

While the textbooks and treatises cited above reliably match the specification in describing "direct conversion," OEW cites only unreliable "fluff"—a hodge-podge of ambiguous third-party patents plus papers that post-date the patent filing by more than a decade. Hansen Decl., ¶¶ 52-56. Moreover, none of OEW's cited documents actually states that "direct conversion" encompasses "very near baseband," which was verbiage conjured up by OEW's attorneys, as addressed in the next section.

### 3. The self-serving statements of OEW's counsel in prosecution cannot expand the claims to cover "very near baseband."

While the patents contemplate only direct conversion, Bluetooth devices typically do not use direct conversion, which negates OEW's infringement theory. As a result, OEW's attorneys attempted to backfill the patents' narrow disclosure during prosecution—nearly *nine years* after the original 2001 application—by proclaiming that the "direct conversion receiver" in the specification performs "down conversion from RF-to-baseband (*or very near baseband*)." *E.g.*, Ex. V at 6-7.

The Federal Circuit has repeatedly rejected similar attempts by patent owners to broaden their claims with self-serving statements during prosecution because "[r]epresentations during prosecution cannot enlarge the content of the specification." *Clare v. Chrysler Grp. LLC*, 819 F.3d 1323, 1332 (Fed. Cir. 2016) (citation omitted). The case law is instructive. In *Clare*, the specification describing a hidden storage compartment in a pickup truck bed "[made] clear that the hinges and laches are not visible from the outside of the truck." *Id.* at 1324-32. During prosecution, the patentee asserted that "the word 'appearance' as used in the

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

21

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

specification contemplates some visible distinctions such as, for example, hinges, latches, vertical cuts, etc." *Id*. at 1331-32. In litigation, the patentee argued that "the prosecution history defined the external appearance limitations to include outwardly visible hinges and latches." *Id*. at 1332. The Federal Circuit rejected the patentee's argument because "the specifications do not contemplate visible hinges or latches" and "the patentee's recitation of visible hinges and laches in the prosecution history cannot expand the scope of the specifications, particularly where the patentee incorrectly characterizes the specifications." *Id*.

Similarly, in *Telcordia Technologies, Inc. v. Cisco Systems, Inc.*, the Federal Circuit rejected the patentee's attempt to use a statement from prosecution to broaden the claims to permit a "payload field" to contain multiple data packets where "the specification does not disclose any mechanisms that would allow" that. 612 F.3d 1365, 1375 (Fed. Cir. 2010). Such "prosecution history comments cannot trump the plain language of the claims and the direct teaching of the specification." *Id*. The Court can and should disregard such an "expression by a patentee during prosecution that he intends his claims to cover more than what his specification discloses." *Honeywell*, 629 F.3d at 1328 (rejecting attempt to use prosecution to broaden "fuel injection system component" beyond the narrow disclosure in the specification).

Likewise here, the Court should disregard OEW's proclamation during prosecution that the direct conversion receiver in the specification could alternatively down convert to "very near baseband." The specification never discloses down conversion only to "very near baseband" or any embodiment providing both direct conversion to baseband and conversion to "very near baseband." As such, OEW's "self-serving statements" to the PTO mischaracterizing the specification should be "accorded no more weight than testimony of an interested witness or argument of counsel." *Moleculon Rsch. Corp. v. CBS, Inc.*, 793 F.2d 1261, 1270 (Fed. Cir. 1986). The ALJ in the ITC case reached an incorrect decision by relying on OEW's statements during prosecution.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

22

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

### 4.    Injecting the vague term of degree "or very near baseband" would render the claims indefinite.

The Court should also reject OEW's proposed construction for the additional reason that it would render the claims invalid for indefiniteness.  A claim is indefinite if it fails to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).  A "term of degree" is indefinite if the intrinsic evidence fails to provide "objective boundaries for those of skill in the art." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1363-64 (Fed. Cir. 2018) ("Our case law is clear that the objective boundaries requirement applies to terms of degree.") (citation omitted).  "[T]he written description is key to determining whether a term of degree is indefinite." *Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n*, 936 F.3d 1353, 1361 (Fed. Cir. 2019) (emphasis and citation omitted).

If broadened to encompass converting to "baseband *or very near baseband*," the "direct conversion" elements would be indefinite.  The claims would cover down conversion not to "near" baseband, but only to "*very*" near baseband—a vague term of degree with no objective anchor in the patents.  *Berkheimer* is directly on-point.  The Federal Circuit invalidated claims reciting "minimal redundancy" because the patent failed to provide any "objective boundary or specific examples of what constitutes 'minimal' in the claims, specification, and prosecution history." *Berkheimer*, 881 F.3d at 1364.  Likewise here, the specification says nothing about how "near" to baseband might qualify as "very near" baseband—no "specific examples," no "points of comparison," nothing.  *Id*.  Hansen Decl., ¶¶ 50-51.  In *Berkheimer*, as here, the patentee cited the prosecution history, where the applicant stated that "minimal" redundancy was claimed because "to eliminate all redundancy in the field of the claimed invention is not likely." *Berkheimer*, 881 F.3d at 1364 (citation omitted).  The problem was that the applicant did "not explain how much redundancy is permitted," *id*., just as the intrinsic evidence here fails to explain what

Cooley LLP
Attorneys at Law
Palo Alto

23

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

might qualify as "very near" baseband. *See also Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370-73 (Fed. Cir. 2014) (invalidating claims reciting an "unobtrusive manner" where the intrinsic record provided no objective boundaries).[8]

### G.    "high quality audio signal representation"

| Plaintiff's Proposed Construction | Apple's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | an uncompressed audio signal representation<br>Alternatively, indefinite |

The "high quality" audio signal representation recited in '627 patent claims 1 and 3 is a subjective term of degree that is indefinite unless it is confined to the only "objective boundaries" disclosed by the intrinsic evidence, which is that the audio signal representation is not compressed. *Berkheimer*, 881 F.3d at 1363-64; *Interval Licensing*, 766 F.3d at 1370-73. As an objective matter, the quality of an audio signal representation depends on many factors, including the sampling rate, frequency range, and any compression algorithm, plus any distortion or signal loss that may be introduced when transmitting a signal over a wireless channel. Hansen Decl., ¶ 59. For example, CD-quality audio has a high sampling rate while MP3 files are typically compressed in a manner that causes a relative loss of audio quality. *See id*.

However, audio quality is also inherently subjective and context-specific, much like beauty is in the eye of the beholder. Hansen Decl., ¶¶ 60-61, 68. Each individual person has a different range of hearing, and the content of the audio (for example, orchestral music versus a spoken voice) directly affects its perceived quality. Music typically involves a more complex set of content and a wider frequency range than a human voice. As such, an audio codec that reproduces human voice perceived as "high quality" might provide only a "tinny" and distorted-sounding reproduction of a symphony orchestra. *See id*.

---

[8] The decision in OEW's prior appeal from the ITC is inapposite. *One-E-Way, Inc. v. Int'l Trade Comm'n*, 859 F.3d 1059 (Fed. Cir. 2017). The panel majority (over a dissent) interpreted "virtually free from interference" to mean that eavesdropping cannot occur, thus eliminating the term of degree "virtually free" and providing an objective boundary. *Id*. at 1064-67; *see* Dkt. 63 at 1.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

24

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

The patents' specification only makes matters worse.  It never explains what might distinguish a "high quality" audio signal from lower quality.  *Id*., ¶¶ 62-66.  It mentions "quality" in only one place.  It states that a receiver audio signal can be processed by "a power amplifier **74** that may be optimized for powering headphone speakers **75** to provide a high quality, low distortion audio music for audible enjoyment by a user wearing headphones **55**." '391, col. 4:19-28.  But this only exacerbates the uncertainty, suggesting that the audio signal is "high quality" for some reason other than being "low distortion," perhaps caused by the power amplifier (as opposed to being an intrinsic quality of the audio signal), and perhaps because the music provides subjective aesthetic "enjoyment" to a particular person.

The patents teach that merely spanning the ~ 20 Hz to 20 kHz frequency range does *not* determine a "high-quality" audio signal; a low-quality audio signal could span that range.  Hansen Decl., ¶ 66.  This is confirmed by the claims.  Claims 1 and 3 recite "a high quality audio signal representation with a frequency range of 20 Hz to 20 kHz" while claim 5 recites "an audio signal with a frequency range of 20 Hz to 20 kHz" that is not recited to be "high quality." '627, claims 1, 3, 5.

To the extent this claim language is to be given objective boundaries, one boundary from the specification would be that the audio signal is not compressed with a compression algorithm.  Hansen Decl. ¶ 70.  The quality of the audio signal would depend on the quality of the audio coming out of the audio player/source, which could be uncompressed CD audio for example.  *Id*.  The best that the disclosed system could do, in theory, would be to provide the same uncompressed output audio quality at the receiver as was provided by the audio player/source.  At a minimum, providing the audio signal without compression—so that the quality is not degraded by compression—would be one condition providing an objective criterion.  *Id*.

## IV.    CONCLUSION

For the foregoing reasons, Apple respectfully requests that the Court adopt Apple's proposed constructions.

Cooley LLP
Attorneys at Law
Palo Alto

25

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS

1

2    Dated:          December 6, 2021              By: /s/ *Heidi L. Keefe*
                                                      HEIDI L. KEEFE (178960)
3                                                     (hkeefe@cooley.com)
                                                      LOWELL D. MEAD (223989)
4                                                     (lmead@cooley.com)
                                                      BENJAMIN S. LIN (232735)
5                                                     (blin@cooley.com)
                                                      COOLEY LLP
6                                                     3175 Hanover Street
7                                                     Palo Alto, California  94304-1130
                                                      Telephone: +1 650 843 5000
8                                                     Facsimile:  +1 650 849 7400
9
                                                      PHILLIP E. MORTON (VA SBN
10                                                    71299)
11                                                    (admitted *pro hac vice*)
                                                      (pmorton@cooley.com)
12                                                    COOLEY LLP
13                                                    1299 Pennsylvania, N.W, Suite 700
                                                      Washington, DC 20004
14                                                    Telephone: (202) 842-7800
15                                                    Facsimile: (202) 842-7889
16
                                                      Attorneys for Defendant
17                                                    Apple Inc.
18

19

20

21

22

23

24

25

26

27

28

Cooley LLP
Attorneys at Law
Palo Alto

26

APPLE'S OPENING
CLAIM CONSTRUCTION BRIEF
2:20-CV-06339-JAK-GJS