# EXHIBIT V

Application No.: 12/570,343
Attorney Docket No.: 1028.4

**REQUEST FOR REEXAMINATION AND RESPONSE TO THE FINAL
REJECTION DATED 06/07/10**

**RESPONSE TO REJECTION OF CLAIMS 1-11, 13-26 UNDER 35 U.S.C. 103**

A finding of obviousness requires that "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertain." 35 U.S.C. §103(a). In *KSR Int'l Co. v. Teleflex, Inc.*, 127 S. Ct. 1727, 82 USPQ2d 1385 (2007), the Supreme Court stated that the factors set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 148 USPQ 459 (1966), control an obviousness inquiry: (1) the scope and content of the prior art; (2) the differences between the prior art and the claimed invention; (3) the level of ordinary skill in the art; and (4) objective evidence of nonboviousness. *KSR*, 127 S. Ct. at 1734, 82 USPQ2d at 1388 (quoting *Graham*, 383 U.S. at 17-18, 14 USPQ at 467).

The *KSR* Court rejected a rigid application of the "teaching, suggestion, or motivation [TSM]" test previously applied by the Court of Appeals for the Federal Circuit. *KSR,* 127 S. Ct. at 1739 USPQ2d at 1395. However, the Supreme Court affirmed that it is "important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does...because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *KSR,* 127 S. Ct. at 1741, 82 USPQ2d at 1396. Once the *Graham* factors have been addressed, the Examiner may apply the TSM test, asking whether (l) a teaching, suggestion or motivation exists in the prior art to combine the references cited, and (2) one skilled in the art would have a reasonable expectation of success. *See* USPTO Guidelines at 57534.

Further, in order to establish *prima facie* obviousness of a claimed invention, all the claim limitations must be taught or suggested by the prior art. *In re Royka,* 490 F.2d 981, 180 USPQ 580 (CCPA 1974). Additionally, in considering a prior art reference, the reference must be considered in its entirety, *i.e.,* as a whole, including portions that would lead away from the claimed invention. *WL. Gore & Associates, Inc.* v. *Garlock. Inc., 721* F.2d 1540, 220 USPQ 303 (Fed. Cir. 1983), cert. denied, 469 U.S. 851 (1984). Moreover,

1

Application No.: 12/570,343
Attorney Docket No.: 1028.4

it is improper to combine references where the references teach away from their combination. *In re Grasselli,* 713 F.2d 731,743,218 USPQ 769, 779 (Fed. Cir. 1983). Indeed, "an applicant may rebut a prima facie case of obviousness by showing that the prior art teaches away from the claimed invention *in any material respect." In re Peterson*, 315 F.3d 1325, 1331 (Fed. Cir. 2003) (Emphasis added).

Moreover, a prior art reference is only appropriate where the "invention as a whole would be obvious to a person of ordinary skill in the field." In re Kumar, 418 F.3d 1361, 76 USPQ2d 1048, 1053 (Fed. Cir. 2005).

*Claims 1-11, 13, 15, 17, 19, 21, 23 and 25 rejected as unpatentable over Altstatt in view of Li*

The obviousness rejection is that the digital wireless communication of Li could be replaced by the FM modulation communication taught in Altstatt. Li is cited for teaching a device for use in portable implementations. It is stated that doing so is the substitution of one known element (i.e., the digital CDMA transmitter/receiver) for another (i.e., analog FM transmitter) to obtain predictable results. The Applicant respectfully disagrees.

Altstatt does not disclose a direct one-to-one digital transmitter-to-headphone communication link. Thus, Altstatt cannot realize the benefits of such a digital link as asserted (Examiner Office Action Mailed 08-09-2005, page 6: "However the system of Altstatt is an analog transmission system that, in operation, lacks the benefits of a digitally encoded and transmitted audio signal" and Office Action Mailed 05-17-2006, page 6 and Office Action Mailed 10-02-2006, page 10: "However, the system of Altstatt an analog transmission system that, operation lacks the benefits digitally encoded and transmitted audio signal."). Additionally, Li clearly discloses a cellular communication system (Li col. 1 lns. 57 – 63 "CDMA digital cellular communications system . . . ," col. 6 lns. 55 – 62 "IMT 2000 . . . IS95 . . . CDMA 2000). IMT 2000, IS95 and CDMA 2000 are all cellular (i.e., cell phone) standards and each requires the centralized control of a base station for operation. Li's centralized control base station system does not disclose a direct one-to-one transmitter-to-headphone communication link.

2

Application No.: 12/570,343
Attorney Docket No.: 1028.4

Applying "the digital CDMA wireless communication of Li to replace the FM modulation communication as taught by Alstatt," as stated on page 6 of the Final Rejection (FRJ) mailed 06/07/2010, *requires* the centralized control of the cellular base station taught by Li (Li col. 7 lns. 9 – 17 "The exchange or the service-providing unit of the mobile net can store various multichannel sounds needed by users, e.g. a great amount of MP3 music data. On request of users, the exchange or the service-providing unit of the mobile net sends the suitable data to the wideband CDMA base station, by which the multichannel data, e.g. MP3 music data, is transmitted to the multichannel mobile equipment through the radio interface of the wideband CDMA). Li teaches the cellular base station approach for "bi-directional" sound communication and interference suppression (Li col. 1 lns. 57 – 63 "CDMA digital cellular communications system can, with large system capacity only restricted by interference … providing bi-directional … sound."). As a result, the Altstatt/Li combination stated in the FRJ requires the cellular base station to meet the interference mitigation claim language "virtually free from interference from device transmitted signals operating in the portable wireless digital audio system spectrum" as found in Claims 3-5, 9, 10, 13, 14, 21 and 23.

Regarding Claim 1, page 5 of the FRJ suggests the Altstatt/Li combination obviates the invention by "Replacing the FM transmitter/receiver implementation of Alstatt to use the digital CDMA communication,". Page 6 of the FRJ continues with "sending unit 100"/receiving unit 200 representing the invention's digital audio transmitter/receiver respectively. This Altstatt/Li combination fails to obviate the invention based on at least the following. The following explanation is applicable not only to Claim 1, but to the other remaining Claims (2-11, and 13, 15, 17, 21, and 23) that stand rejected under the Altstatt/Li combination.

Moreover, for Li's sending unit 100 to communicate with receiving unit 200 without interference anomalies, the centralized control of a base station is required (Li col. 1 lns. 57 – 63, col. 6 lns. 55 – 62 and Li col. 7 lns. 9 – 17 as referenced above), especially when there exists at least one other "sending unit 100" in the vicinity. The Altstatt/Li combination does not suggest a portable audio system that includes a mobile transmitter and mobile receiver with a distributed architecture to one of ordinary skill.

3

Application No.: 12/570,343
Attorney Docket No.: 1028.4

Indeed there is no motivation for one of ordinary skill to combine Altstatt and Li as the end product would not suggest the present invention.

To further support this position, the Examiner is referred to the underlined portion of Exhibit I (herein attached) "From WPANs to Personal Networks Technologies and Applications" where it is stated: "A wireless network can be distributed or centralized. Distributed networks are those where each device accesses the medium individually and transmits the data without any central control . . . . Centralized network architecture has one network element, which controls the communication of various devices." The claim language "configured for independent CDMA communication operation" (as seen in Claims 1, 3-9, 13, 15, 21, and 23) reflects the distributed architecture and is supported by the specification of 10/027,391 application in paragraph 0016. ("This … (CDMA) may be used to provide each user independent operation." (as well as other portions of the specification)).

Within the invention, the task of each receiver, among other things, is to mitigate interference in the vicinity in order to receive the correct transmission successfully. Thus, the direct conversion receiver (DCR) disclosed in the present invention (as recited in Claims 3-7, 9, 10, 13, 15, 17, 21, and 23) utilizes, among other things, "timing and synchronization to capture the correct bit sequence embedded in the received spread spectrum signal" (Parent Application 10/027,391 paragraph 0015). Further support for this language is contained in paragraph 0016 of the 10/027,391 application, where it states: "Other code words from wireless digital audio systems 10 may appear as noise to a particular audio receiver 50. This may also be true for other device transmitted signals operating in the wireless digital audio system 10 spectrum." Moreover, Patent 7,412,294 col. 3 lns. 32-34 state: "The battery powered transmitter 20 sends the audio music information to the battery powered receiver 50 in digital packet format."

When packets are communicated over a wireless link it may be referred to as packet radio. The underlined section of the text "Wireless Communications Principles & Practice" has been provided for clarification. (please see Exhibit II: "… called packet radio when used over a wireless link . . . . This benefit is valuable for the case of mobile services where the available bandwidth is limited. The packet radio approach supports intelligent protocols for data flow control and retransmission, which can provide highly

Application No.: 12/570,343
Attorney Docket No.: 1028.4

reliable transfer in degraded channel conditions."). While other code words and/or other device transmitted signals are in the vicinity they can create associated noise channel conditions at the receiver that may prevent the capture of the packet with the correct bit sequence. Based on the above disclosures, it is clear that both intended and unintended spread spectrum packet signals can appear at the receiver, but only the packet with the correct bit sequence is captured by the DCR. Moreover, there exists several data delivery types (for clarification, please see section 16.2.1, of the book from Vijay Garg entitled Wireless Communications and Networking, (relative to the CDMA2000 cellular communication taught by Li) accessible on the following Google books website: http://books.google.com/books?id=UE2wEc9NfB8C&pg=PA544&lpg=PA544&dq=cdm a2000+isdn&source=bl&ots=pB26eq6oLc&sig=nzleT7D4Q_P-KFMduSkb9b5015s&hl=en&ei=lZw8TKzcHZL4swOg0uDaCg&sa=X&oi=book_result &ct=result&resnum=2&ved=0CBoQ6AEwAQ#v=onepage&q=cdma2000%20isdn&f=fa lse).

That source states: "End user data-bearing services. Services that deliver any form of data on behalf of the mobile end user, including packet data (e.g., IP service), circuit switched data services (e.g., B-ISDN emulation services), and SMS. Packet data services conform to industry standard connection-oriented and connectionless packet data including IP-based protocols (e.g., transmission control protocol (TCP) and user data protocol (UDP) and OSI connectionless interworking protocol (CLIP)). Circuit-switched data services that emulate international standards-defined, connection-oriented services such as asynchronous (async) dial-up access, fax, V.120 rate-adapted ISDN, and B-ISDN services." Of these data delivery types available, the Altstatt/Li combination does not disclose or suggest a digital packet format for audio information as is included in the claim language and does not obviate the invention. The digital packet claim language is recited in Claims 1-7, 9, 10, 13, 15, 17, 21, and 23.

Moreover, within the scope of the invention (based on paragraphs 0015 and 0016 of the 10/027,391 application, as well as Patent 7,412,294 column 3 lines 32-34), the DCR accounts for, among other things, (1) relevant timing metrics to capture the packet with the correct bit sequence embedded in the received spread spectrum signal within a in-motion transmitter, in-motion receiver, distributed architecture and (2) relevant

5

Application No.: 12/570,343
Attorney Docket No.: 1028.4

synchronization metrics to capture the packet with the correct bit sequence embedded in the received spread spectrum signal within a in-motion transmitter, in-motion receiver, distributed architecture. Claims 3, 5, 9, 10, 13, 15, 21, and 23 recite the "direct conversion module configured to capture packets . . . ." It should be noted that synchronization includes forms of acquisition and tracking (please reference underlined section of Exhibit III taken from "Digital Communications Techniques Signal Design and Detection"). As a result, timing and synchronization, to capture the intended signal components, has been disclosed and broadly covers all types of timing and synchronization distributed architecture techniques to perform such a task.

Regarding Claim 13, the Altstatt/Li combination does not disclose a direct conversion receiver (DCR) as stated on page 9 in the FRJ where Li's element "(202)" is referenced. There is no evidence that Li's item 202 ("wideband CDMA demodulator") is a DCR. The DCR disclosed in the present invention, among other things, performs direct down conversion from radio frequency (RF) to baseband (or very near baseband), thus, omitting intermediate frequency (IF) down conversion components that are often used. The invention utilizes the DCR for, among other things, down conversion from RF-to-baseband (or very near baseband), eliminating unnecessary IF components, which reduces the size and power consumption of the module. The Altstatt/Li combination does not disclose a DCR nor does it suggest the use of a DCR within the invention. Because one of ordinary skill would not look to Alstatt and Li to create the present invention with any reasonable expectation of success, the obviousness rejection should be removed.

In addition, the use of the DCR in the invention, suppresses aliasing noise effects by use of the anti-aliasing filters (typically low pass filters or some version thereof) located within the DCR, thus, aiding to preserve the fidelity of the transmitted high quality audio signal. The Altstatt/Li combination does not teach or suggest a DCR, thus, cannot realize the benefits of the claim language "a direct conversion module configured to capture the packet with the correct bit sequence embedded in the received spread spectrum signal." (contained in Claims 3-7, 9, 10, 13, 15, 17, 21, and 23). Neither Li, Altstatt, Lindemann (Lindemann discloses in paragraph 0057 "In the RF receiver embodiment of FIG. 3, …, The RF Downconverter 302 modulates the RF signal, using a sinusoid generated by the RF VCO 310, *down to IF frequency. The IF signal is further*

6

Application No.: 12/570,343
Attorney Docket No.: 1028.4

*down modulated* by the IF Demodulator 303. The output of the IF Demodulator is a complex signal consisting of I and Q--real, imaginary--running at the Chip Rate") nor any combination of the three teach, suggest, or disclose the DCR of the present invention. Claims 3-7, 9, 10, 13, 15, 17, 21, and 23 should be in allowance on the presence of the DCR alone.

Finally, intersymbol interference (ISI) distorts the audio signal content, causing a major obstacle to the transmission of high data rate audio from an in-motion transmitter to an in-motion receiver. Referring to the underlined sections of the Exhibit IV text "Adaptive Filter Theory," Second Edition, by Simon Haykin, ISI "is caused by dispersion in the transmit filter, the transmission medium, and the receive filter … we usually find that intersymbol interference is the chief determining factor in the design of high-data rate transmission systems … intersymbol interference, if left unchecked, can result in erroneous decisions when the sampled signal at the channel output is compared with some preassigned threshold by means of a decision device."

Within the present invention, both the digital audio transmitter and digital audio receiver may be in motion (see Claims 1, 3, 5, 6, 7, 8, 10, 15, 17, and 23), thus, the relative position and velocity of both the transmitter and receiver (both in-motion transmitter and in-motion receiver present spatial and temporal variations) will be constantly changing (e.g., a person running with the wireless digital audio system). Because ISI results when the in-motion digital audio transmitter attempts to communicate high symbol rate audio to the in-motion digital audio receiver, ISI must be suppressed. The present invention mitigates ISI to maintain fidelity of the high data rate audio signal while the in-motion transmitter is in communication with the in-motion receiver. The ISI mitigation is performed by, among other things, the claimed encoder ("an encoder with means to encode said original audio signal representation to reduce intersymbol interference") and decoder ("a decoder with means to decode the applied reduced intersymbol interference coding of said original audio signal representation") (Claims 3, 5, 6, 7,9-11, 13, and 21). The Altstatt/Li combination does not disclose or suggest an encoder/decoder pair for the reduction of ISI within an in-motion transmitter and in-motion receiver high symbol rate audio system. The claims should be in allowance on the presence of the encoder and decoder language alone.

7

Application No.: 12/570,343
Attorney Docket No.: 1028.4

These explanations and amendments remove the obviousness arguments for all remaining Claims 1-11, and 13, 15, 17, 21, and 23. Thus, for at least the reasons provided above, the prior art references are deficient in suggesting that their combination could produce the present invention, and the remaining Claims should be in allowance.

Without assenting to the rejections, the applicant has cancelled claims 14, 16, 18-20, 22, and 24-26.

August 3, 2010

Respectfully Submitted,

Megan E. Lyman, Registration No. 57,054
1816 Silver Mist Ct.
Raleigh, NC 27613
(919) 341-4023

8